**COMMONWEALTH EDISON
CO., Petitioner,**

v.

**UNITED STATES NUCLEAR REGULA-
TORY COMMISSION, Respondent.**

No. 85–2928.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 10, 1986.
Decided May 15, 1987.
Rehearing Granted July 9, 1987.
Decided on Rehearing Sept. 1, 1987.

Frederick C. Williams, Washington, D.C., for petitioner.

Irwin B. Rothschild, III, U.S. Nuclear Reg. Comm., Washington, D.C., for respondent.

Before WOOD and COFFEY, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

In this case Commonwealth Edison ("Edison") challenges as illegally retroactive a final order of the Nuclear Regulatory Commission ("NRC") requiring Edison to pay fees at the price ceilings established in a 1984 regulation for the NRC's license application review work regarding four nuclear reactors. Edison also challenges the interest and penalty charges applied to the review fee. The NRC argues that we have no jurisdiction because Edison failed to petition for review of the 1984 Rule within the statutory time limit. The NRC also argues that even if we have jurisdiction, the fees are not illegally retroactive. We have jurisdiction over this case, and hold that both the fees and the penalty and interest charges were proper.

**I**

In 1978 the NRC promulgated a final rule amending a regulation requiring, *inter alia,* applicants for operating licenses for nuclear facilities to pay a fee for the work involved in the NRC's review of the license application. 43 Fed.Reg. 7210 (Feb. 21, 1978) ("1978 Rule"). The 1978 Rule was issued under the authority of the Independent Offices Appropriations Act ("IOAA"), which is presently codified at 31 U.S.C. § 9701.

The 1978 Rule set ceiling figures or caps, above which any party charged a fee under the 1978 Rule would not be assessed. 10 C.F.R. § 170.21 & n. 3, 43 Fed.Reg. 7219–20 (Feb. 21, 1978). The rule provided that fees "are payable upon notification by the Commission when the review of the project is completed." 10 C.F.R. § 170.12(b), 43 Fed.Reg. 7218–19 (Feb. 21, 1978). A related rule set hourly rates for the professional services of the NRC staff members performing the review work. The review work we are concerned with here was performed during the period the 1978 Rule was in effect.[1]

In 1982 the NRC issued a notice of proposed rulemaking ("1982 Proposed Rule") to amend the 1978 Rule. 47 Fed.Reg. 52,-454 (Nov. 22, 1982). In its proposed rule, the NRC suggested removing all ceilings relevant to the applications at bar. *Id.* at 52,454, 52,456.

Several utilities, including Edison, commented on the proposed rule. Some of these comments specifically raised the challenge to the 1984 Rule that Edison raises in this petition. The final rule ("1984 Rule") was promulgated on May 21, 1984. 10 C.F.R. § 170 (1984), 49 Fed.Reg. 21,283 (May 21, 1984). The 1984 Rule became effective on June 18, 1984. It retained

---

1. The 1984 Rule changed the time at which bills were due and payable from "upon notification by the Commission when the review of the project is completed," 10 C.F.R. § 170.12(b) (1978), 43 Fed.Reg. 7218–19 (Feb. 21, 1978), to a rule providing that applicants would be billed at six-month intervals. 10 C.F.R. § 170.12(b) (1984), 49 Fed.Reg. 21,362 (May 21, 1984). The first bill on pending applications under the 1984 Rule would include all costs charged from the

time the construction permit was granted. *Id.* Because the effective date of the 1984 Rule was June 18, 1984, and the bill charged for costs through June 23, 1984, some review work may have been performed that was unquestionably subject to the 1984 Rule's hourly rates and ceilings. The parties have treated the work done during these days as *de minimis* for the purposes of this rule and we see no reason to do otherwise.

ceilings but set them at a higher level than the 1978 Rule. 10 C.F.R. §§ 170.20–21, 49 Fed.Reg. 21,363 (May 21, 1984). It is important to note, however, that the 1984 Rule continued to apply the 1978 hourly rates to all review work performed prior to the effective date of the 1984 Rule. These hourly rates were not raised. Thus the cost for all the review work at issue here was assessed at the 1978 hourly rates.

In early 1985, the NRC issued bills to Edison under the 1984 Rule for license application review work for four nuclear reactors, two at Edison's Braidwood facility and two at Edison's Byron facility. These bills stated that they covered "the cost of the Operating License Review through June 23, 1984." They were assessed using the 1978 hourly rates for professional services. All of the invoices exceeded the 1978 ceilings but were within the 1984 ceilings.

Edison contested the fees as illegally retroactive and eventually paid a lower amount. The NRC issued several notices demanding payment, culminating in a final order issued on September 13, 1985, that charged Edison for the unpaid remainder. The notice also charged interest and a penalty pursuant to 31 U.S.C. § 3717. In response Edison on November 4, 1985, filed a petition in this court to review both the propriety of the fees and of the interest and penalty charged thereon. After the announcement of this court's original decision on May 15, 1987, Edison filed a petition for rehearing, to which the government responded. We granted the petition for rehearing on July 9, 1987, and withdrew and vacated our original opinion. We now render this opinion on rehearing.

## II

As the issue of initial forum jurisdiction over these fee decisions of the NRC has not been previously addressed explicitly, we treat the matter briefly in order to satisfy our duty to determine our own jurisdiction. The federal appeals courts have exclusive jurisdiction under a provision of the Administrative Orders Review Act (more commonly referred to as the Hobbs Act) over "all final orders of the Atomic Energy Commission [now the Nuclear Regulatory Commission] made reviewable by section 2239 of title 42." 28 U.S.C. § 2342(4). Section 2239(b) of Title 42 provides that the Hobbs Act governs review of "[a]ny final order entered in any proceeding of the kind specified in subsection (a) [of section 2239]." Subsection (a) proceedings include those "for the granting, suspending, revoking, or amending of any license." 42 U.S.C. § 2239(a)(1). See Florida Power & Light Co. v. Lorion, 470 U.S. 729, 105 S.Ct. 1598, 1601, 84 L.Ed.2d 643 (1985).

The general rule reiterated by the Lorion Court is that "[i]n the absence of specific evidence of contrary congressional intent, ... review of orders resolving issues preliminary or ancillary to the core issue in a proceeding should be reviewed in the same forum as the final order resolving the core issue." Lorion, 105 S.Ct. at 1606. Lorion reviewed the legislative history and "the basic congressional choice of Hobbs Act review," Lorion, 105 S.Ct. at 1605, and concluded that "[a]bsent a firm indication that Congress intended to locate initial APA review of agency action in the district courts, we will not presume that Congress intended to depart from the sound policy of placing initial APA review in the courts of appeals." Id. at 1607. The Supreme Court found Congress's sound policy to be based on several considerations: the desire to avoid unnecessary duplication of factfinding, the preference for a factual record developed by the agency, and the desire for judicial review to undercut as little as possible the "very purpose" of summary and informal procedures—to save time where possible on matters not requiring the detailed formal application of agency expertise. Id. at 1605–07.

In Lorion the Court determined that the Hobbs Act granted the federal appellate courts exclusive initial review jurisdiction over a challenge to the NRC's denial of a request to institute a proceeding to suspend a nuclear plant's operating license. Id. at 1605, 1608; see 10 C.F.R. § 2.206. The core issue was whether to suspend a

license by invoking a section 2239(a) proceeding. The ancillary issue was whether to grant a private individual's request that the NRC institute such a proceeding.

In this case the core issue is whether to grant operating licenses in a section 2239(a) proceeding. The "ancillary or preliminary" issue is whether to uphold the NRC's bill for review costs incurred during the section 2239(a) proceeding considering Edison's license application. The secondary issue here bears at least the same degree of connection to the core issue as the secondary issue in *Lorion* bore to the core issue there. Here, as in *Lorion,* duplicating and bifurcating judicial review would exact a significant cost to the agency's efficiency and workload. Congress's intent was to avoid this cost. *Id.* at 1606–08; *see also Rockford League of Women Voters v. NRC,* 679 F.2d 1218, 1220–21 (7th Cir.1982) (applying similar factors and reaching same result as *Lorion* under facts analogous to those in *Lorion* ).

Of course, if Congress had expressed some other intent we would be bound to follow it. *Lorion,* 105 S.Ct. at 1609. But that is not the case here. The Court in *Lorion* determined that in Hobbs Act cases "the indications of legislative intent we have been able to discern suggest that Congress intended to locate initial subject matter jurisdiction in the courts of appeals." *Id.* There is no legislative intent evinced in the IOAA or its legislative history that suggests an intent contrary to that Congress expressed in the Hobbs Act. Thus the intent in the Hobbs Act favoring initial appellate review is applicable to challenges to fee regulations promulgated by the NRC under the IOAA.

Finally, we note that other courts of appeals have exercised initial review jurisdiction over challenges to the NRC's license fee regulations. *New England Power Co. v. NRC,* 683 F.2d 12 (1st Cir.1982); *Mississippi Power & Light Co. v. NRC,* 601 F.2d

223 (5th Cir.1979). While neither opinion discussed initial review jurisdiction, both courts were of course under the same obligation we are to satisfy ourselves of subject-matter jurisdiction before proceeding to the merits. Edison has chosen the proper initial forum in which to challenge its license application review fee.

### III

■ The NRC argues that petitioner's challenge to its bill for licensing application review has come too late because the Hobbs Act requires that a party aggrieved by a final order file a petition for its review within sixty days of the order's entry, 28 U.S.C. § 2344, and the NRC claims that the review requested here is of the 1984 Rule itself and not simply its application to Edison. Edison does not dispute the application of the Hobbs Act or its character as a jurisdictional bar, which may not be altered or waived by the courts. *See, e.g., Illinois Central Gulf Railway Co. v. ICC,* 720 F.2d 958, 960 (7th Cir.1983); *Atchinson, Topeka, and Sante Fe Railway v. ICC,* 687 F.2d 912, 918 (7th Cir.1982); *see also, e.g., Eagle-Picher Industries v. EPA,* 759 F.2d 905, 911 (D.C.Cir.1985). On rehearing Edison has suggested that even if the jurisdictional bar might prevent it from attacking the rule prior to enforcement it does not prevent it from attacking the rule in a judicial proceeding to review the agency's enforcement of the rule through the application of that rule to Edison's license application review fee.[2]

The Hobbs Act provision at issue reads simply that "[A]ny party aggrieved by the final order may, within 60 days of its entry, file a petition to review the order in a court of appeals where venue lies." 28 U.S.C. § 2344. This language, while a model of terseness, is not immediately clear. In construing its reach we are guided by two cardinal principles governing the interpre-

---

**2.** We note here that by "enforcement" review in this case we do not necessarily mean an action brought by an agency in court to enforce an order against a private party. In a case like this, it is the *agency's* application of a rule to a private party in administrative proceedings that

is the enforcement action in question. Thus this petition for review represents judicial review of an agency's enforcement proceeding even if the private party files the petition for review as a result of the agency enforcement.

tation of statutes that provide for judicial review of agency action. The first is a fundamental principle announced in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), which declared the "basic presumption" that judicial review of administrative action exists and added the corollary that such review cannot be restricted absent "clear and convincing evidence" of a contrary legislative intent. The second is the *Abbott Laboratories* Court's adoption of the principle that "[t]he mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others. The right to review is too important to be excluded on such slender and indeterminate evidence of legislative intent." *Id.* at 141, 87 S.Ct. at 1511–12 (quoting Jaffe, *Judicial Control of Administrative Action* 357 (1965)). The Supreme Court has recently restated and applied these principles in *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986). *See also Block v. Community Nutrition Institute*, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984).

The Hobbs Act's sixty-day restriction must mean at least that direct preenforcement challenges to rules brought after the expiration of the time limit are generally beyond the court's jurisdiction. However, the cases interpreting the section establish that indirect challenges to the rule brought when the rule is applied to a particular individual are within the court's jurisdiction. *Texas v. United States*, 749 F.2d 1144, 1146 (5th Cir.), *cert. denied*, 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 642 (1985); *Tri-State Motor Transit Co. v. ICC*, 739 F.2d 1373, 1375 n. 2 (8th Cir.1984); *see also Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C.Cir.), *cert. denied*, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959). Challenges at the enforcement stage typically occur after the issuance of a final order, as here, by the agency to a particular party that itself serves to invoke the Hobbs Act and provides jurisdiction for review if an action is brought within sixty days. Allowing review when a challenge is brought to the application of a rule is in keeping with the rule of *Abbott Laboratories* that suggests that the provision for direct review of legislative rules should not, without more, serve to prohibit indirect review of those rules in enforcement proceedings. *Abbott Laboratories*, 387 U.S. at 141, 87 S.Ct. at 1511–12 (quoting Jaffe, *Judicial Control of Administrative Action* 357 (1965)). Congress's grant of power to review one act (the promulgation of the rule) should not serve to circumscribe the power to review another act (the application of a rule by an agency in a specific proceeding to enforce the rule).

Some statutory review schemes explicitly provide for review of the underlying legislative rule in an enforcement proceeding. *E.g.*, 15 U.S.C. § 2618(a) (Toxic Substances Control Act); 15 U.S.C. § 57a(e)(5)(A) & (B) (Magnuson-Moss Act). Others explicitly prohibit such review. *E.g.*, 42 U.S.C. § 9613(a) (Comprehensive Environmental Response Compensation and Liability Act of 1980); 42 U.S.C. § 7607(b)(2) (Clean Air Act). The Hobbs Act contains no language one way or the other. Applying the *Abbott Laboratories* presumption in favor of judicial review in light of this silence in legislative language clearly suggests that such jurisdiction exists.

The most venerable statement in this regard is that of the District of Columbia Circuit in the leading case of *Functional Music, Inc. v. FCC*, 274 F.2d 543, 545–47 (D.C.Cir.), *cert. denied*, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959). The court in that case allowed preenforcement review of a rule after the Commission had denied Functional Music's request to eliminate or further postpone the effective date of the rule, all despite the earlier passage of the statutory time limit. In so doing, it announced that

The rules here attacked were initially promulgated in 1955. It very well may be that they were then sufficiently final to support judicial review. [Footnote omitted.] No such review had been sought, however. And as to those rules, the statutory period specified for review of, or appeal from, Commission orders and decisions has long since passed.

Nevertheless, we are persuaded that judicial examination is now permissible. As applied to rules and regulations, the statutory time limit restricting judicial review of Commission action is applicable only to cut off review directly from the order promulgating a rule. It does not foreclose subsequent examination of a rule where properly brought before this court for review of further Commission action applying it. For unlike ordinary adjudicative orders, administrative rules and regulations are capable of continuing application; limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity. And see *Columbia Broadcasting System v. United States,* 1941, 316 U.S. 407, 421, 62 S.Ct. 1194 [1202], 86 L.Ed. 1563, for example, where the Supreme Court clearly contemplated the continuing availability of review of Communications Commission rules and regulations. *Id.* at 546–47. While *Functional Music* was decided in the context of whether review existed over a denial to reconsider a legislative rule, its language created a clear exception for actions in which the agency applies a general rule to a particular party, such as the action at bar. *Functional Music* simply recognized that the growing understanding that regulations and rules were reviewable "orders" under the Hobbs Act, *see* 4 Davis, *Administrative Law* § 23.5 (2d ed. 1982); *cf. United Gas Pipe Line Co. v. FPC,* 181 F.2d 796 (D.C.Cir.), *cert. denied,* 340 U.S. 827, 71 S.Ct. 63, 95 L.Ed. 607 (1950) (holding that an administrative rule could not be reviewed under the Hobbs Act because it was not an "order" as required by the act), should not undercut the right to challenge the underlying rule when an agency applies it. Later cases have applied this language to enforcement cases. *E.g., Texas v. United States,* 749 F.2d at 1146; *Tri-State Motor Transit Co.,* 739 F.2d at 1375 n. 2 (8th Cir.1984).

In addition, the courts have more readily found jurisdiction to review the substantive authority of legislative rules than they have challenges to the procedure by which the rule was established. *E.g., Texas v. United States,* 749 F.2d at 1146; *Tri-State Motor Transit Co.,* 739 F.2d at 1375 n. 2 (8th Cir.1984); *National Resources Defense Council v. NRC,* 666 F.2d 595, 602 (D.C.Cir.1981).

Two cases of this court argued in the briefs do not suggest otherwise. The first, *Atchison, Topeka, and Santa Fe Railway Co. v. ICC,* 687 F.2d 912 (7th Cir.1982), involved an attempt in an enforcement proceeding to challenge an earlier enforcement decision, not a legislative rule of general applicability. In that case the ICC allowed a waiver of certain charges in a particular case in a service order and the railroads in a later proceeding outside the statutory time limit attempted to challenge the order. The second case, *Illinois Central Gulf Railway Co. v. ICC,* 720 F.2d 958 (7th Cir.1983), does contain dicta suggesting that the Hobbs Act's time limit generally applies in challenges to general rules brought in enforcement actions, but it then goes on *to find jurisdiction* over the case on the independent ground that the regulated parties received inadequate notice of the order. *Id.* at 959–60. The *Illinois Central* court therefore did not need to explore the question of enforcement jurisdiction where notice is adequate, which is the case before us today.

Finally, this not a case in which the specific structure and purpose of a particular act require that judicial review be cut off. *E.g., Morris v. Gressette,* 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977); *Block,* 104 S.Ct. at 2455–57; *see also, e.g., Turner v. U.S. Parole Com'n,* 810 F.2d 612 (7th Cir.1987). The Hobbs Act controls the jurisdiction over petitions for review of final orders of several agencies. *See* 28 U.S.C. § 2342. The final orders of these agencies occur in a myriad of different settings, and the settings can vary significantly within each agency. We think it highly unlikely that Congress would have chosen to cut off the traditionally available avenue of review at the enforcement stage in all these situations absent some clearer warning to the regulated individuals that their ability to gain review would be lost unless they chal-

lenged the legislative rule at the preenforcement stage. We therefore conclude that Edison has properly invoked the jurisdiction of this court.

## IV

■ The final order on review covers costs incurred by the NRC in reviewing the license applications for Edison's four reactors up to June 23, 1984. The costs were incurred during the period that the 1978 Rule was in effect. The fees were assessed when the 1984 Rule was in effect and the final order applied the ceilings of the 1984 Rule. The hourly rates applied in calculating the fee were, however, the hourly rates appropriate under the 1978 Rule.[3] Edison asserts on the merits that the final order is retroactive. Edison also claims that it received insufficient notice under the IOAA of the 1984 Rule's reach to cover pending applications. *See New England Power Co. v. NRC,* 683 F.2d 12 (1st Cir.1982) (interpreting IOAA to require adequate notice to regulated parties of costs to be recovered). We disagree with both contentions. The work was billed at the hourly rate in effect at the time the work was performed. Thus there can be no complaint that the hourly rates were retroactive.

■ With regard to the applicable ceilings, the 1978 Rule established only that license application review fees that were assessed and charged under the 1978 Rule would be subject to the limitation of the maximum fee ceiling contained in that rule. *See* 10 C.F.R. § 170.21 & n. 3, 43 Fed.Reg. 7219–20 (Feb. 21, 1978); 43 Fed.Reg. 7215 (Feb. 21, 1978). The longstanding regulations of the NRC provided that the fees would not be assessed and charged until the license application review process was completed, and a 1981 interpretive regulation added that the review process was considered completed (and thus a fee would also become due and payable) not only

upon the NRC's final decision whether to license a facility, but also upon the withdrawal of an application. 46 Fed.Reg. 49,-573 (1981); *see New England Power Co.,* 683 F.2d at 13–14. Edison's review was not completed at the time the 1984 Rule replaced the 1978 Rule. Nor had it chosen to withdraw its application. Thus that fee assessment fell without the limitation set in the 1978 Rule. Even assuming that it is significant that the work was performed under the 1978 Rule, that significance could only extend, at the most, to lock in place the hourly rates for review, since the ceilings under the 1978 Rule were only locked in when the review work was completed or the application withdrawn and neither of those events occurred prior to the effective date of the 1984 Rule. As we have noted, the fees challenged here were calculated using the hourly rates in effect at the time the work was performed.

We do not think there is any great difficulty in reading the date on which the agency established that fees became due and payable to also establish the date on which the right to the ceilings established by the 1978 legislative rule become fixed. But we do not need to rely alone on these provisions to establish the date on which the right to the 1978 ceilings would vest. The NRC had in the past applied raises in fees to pending applications, *see* 43 Fed. Reg. 7210, 7215 (1978) (comments to 1978 Rule noting that "in the case of ... operating licenses, where the permit review is completed on or after the effective date of this amendment to part 170 [the license fee schedule], the revised schedule will apply"), and the Statement of Considerations accompanying the 1982 Proposed Rule (which became, with amendments, the 1984 Final Rule), clearly notified the industry that the 1984 fee ceilings would apply to applications pending at the time the 1984 Rule became effective. It proposed in pertinent part that under the 1984 Rule all actual costs would be charged for review work

---

**3.** While there is some uncertainty in the record regarding whether license fees are due upon completion of the review work or upon the NRC's notification to an applicant of a decision whether to license a nuclear reactor, we need

not, and do not, resolve that issue today because neither point had been reached for any of the four reactors here at the time the 1984 Rule became effective.

performed "[w]ith respect to operating license applications currently on file ... from the date the CP [construction permit] was issued to the issuance of the full power (100%) operating license." 47 Fed.Reg. 52,454, 52,456 (Nov. 22, 1982). The 1984 Rule, of course, chose to raise the ceilings rather than abolish them and recover all costs, but nothing in the final rule suggested an alteration of the NRC's intent to apply the 1984 Rule to applications on which review work was not completed under the 1978 Rule. These NRC regulations confirm our reading of the fee provisions, and they also provided contemporaneous confirmation to the industry that the rights to particular ceilings would only vest when the fees became due and payable.[4] This was clear in the 1978 Rule and had also been the rule under earlier NRC regulations. Thus, contrary to its position, Edison was adequately notified that the right to particular fee ceilings would vest only when the fee became due and payable, and it accordingly took upon itself the risk that a new ceiling would become applicable prior to the completion of review work at one or more of its facilities. Because the right to the ceilings did not vest prior to the effective date of the 1984 Rule, the application of the 1984 ceilings to the fees at issue was not retroactive.

It is true, of course, that the 1978 Rule of the NRC provided little assurance to the regulated parties that their license application review costs would in fact be limited by the 1978 ceiling. License application reviews for nuclear plants are detailed and lengthy undertakings that may well take several years. There was no guarantee that the review process for any facility would be completed during the life of the 1978 Rule, and Edison took upon itself the

risk that a new rule would be in place when its fees became due and payable.

It is important to remember that the NRC was under no obligation to limit in any way its recoupment of all the costs associated with the review of the license application. Its authority to recoup those costs derives from the IOAA, which empowers agencies to recover *all* of their costs that provide special benefits to the regulated parties. 31 U.S.C. § 9701; *see, e.g., New England Power Co. v. NRC,* 683 F.2d 12 (1st Cir.1982); *Mississippi Power & Light Co. v. NRC,* 601 F.2d 223 (5th Cir.1979). Thus the IOAA would have allowed the NRC to do away with ceilings altogether and to charge Edison for all of the reasonable costs it incurred in the review of Edison's license application that provided a special benefit to Edison. That the NRC chose to bind its hands with regard to those utilities properly subject to the 1978 Rule merely reveals the NRC in that instance chose not to exercise the full extent of the power it maintains under the IOAA. The provisions in the 1978 Rule thus allowed the NRC the flexibility to raise the fee ceilings should an increase become necessary to allow the NRC to recover its reasonable costs. Such a provision is in keeping with the NRC's duty to recover costs assessable under the IOAA and did not bind the NRC to those figures for all time and all applications, no matter how long the review might take or how much the review process might need to be altered.

The case law has made clear for some time that as a general rule of administrative law the filing of an application does not itself create a vested right in the applicant to the particular terms under which the license will be issued. *Nevada Power*

4. In its briefs and at oral argument Edison employed as a refrain references to a footnote in the 1978 Rule. The footnote provided that "[w]hen review of the permit, license, approval, or amendment *is complete,* the expenditures for professional manpower [sic] and appropriate support services will be determined and the appropriate fee will be assessed, but in no event, will the fee exceed that shown in the schedule of facility fees." 43 Fed.Reg. 7210, 7220 (Feb. 21, 1978) (formerly codified at 10 C.F.R. § 170.21 n.

3) (emphasis added). Contrary to Edison's position, this footnote also makes clear that the appropriate fee to be assessed is the fee in effect when the review is completed. The review work on Edison's four reactors was not completed under the 1978 Rule. This footnote thus supports our conclusion that the NRC in its rules established that the right to the 1978 fee ceilings would vest only upon the completion of the review work for an application.

*v. Watt,* 711 F.2d 913, 933 n. 19 (10th Cir.1983); *Clay Broadcasting Corp. of Texas v. United States,* 464 F.2d 1313, 1320 (5th Cir.1972), *rev'd sub. nom. on other grounds,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974); *Hannifin v. Morton,* 444 F.2d 200, 202–03 (10th Cir.1971). The approval of a license is of sufficient independence from the filing of the application to allow an agency to change the terms prior to such a final decision. *Clay Broadcasting,* 464 F.2d at 1320. Unless the agency binds itself to other terms the applicant has only a hope that the license will be granted on the terms obtaining when the application was filed. While charges under the IOAA for application review costs differ from the terms of a license in that such work is performed prior to the issuance of the license, that distinction does not require the general rule to be altered. *Nevada Power,* 711 F.2d at 933 n. 19.

It is true that Edison could not, in a practical sense at least, avoid the payment of review costs in the same way that applicants dismayed at the alteration of terms placed on a license could avoid those terms by withdrawing their applications. Edison would have had to pay the costs of review to date even had it withdrawn its applications, and it would be unrealistic to propose that a company in Edison's position can freely choose to walk away from the construction or operation of a nuclear plant when it is informed of a potential review rate increase and fails to persuade the agency to desist. The massive past commitment of resources virtually prohibits such a course. Nevertheless, the simple fact of the matter is that Edison made a conscious decision to accept the NRC's monopoly on regulation of the industry when it first chose to construct nuclear plants. It did so with full knowledge that the industry would be heavily regulated. That Edison hoped at an earlier time that the history of NRC regulation would take a different course is no argument that it must now have its way. Edison knew or should have known at the time of the 1978 Rule that the 1978 ceilings would only apply to those applications on which review was completed during the effective period

of the 1978 Rule. The applications on review here were not so completed. Edison also had full notice of the change in the ceilings contemplated in the 1984 Rule and took full advantage of its right to participate in the rulemaking process. The use of the 1984 ceilings in calculating Edison's fees was not retroactive and Edison was afforded adequate notice by regulation that the ceilings would apply.

## V

Edison argues that even if it must pay the full principal of the fee issued to it, it still may not be held liable for interest or penalties under 31 U.S.C. § 3717 because the NRC is not an "executive or legislative agency" required to exact interest and penalties under that section. Edison also argues it is not liable to pay both interest and a penalty fee on the amount it has contested and withheld. We reject both of these contentions.

### A. *"Executive or Legislative" Agencies Under Section 3717*

Section 3717 of Title 31 had its origin in the Debt Collection Act of 1982 ("1982 Act"), Pub.L. No. 97–365, § 11, 96 Stat. 1749, 1755–56, and was originally codified as 31 U.S.C. § 952(e). The 1982 Act amended the Debt Collection Act of 1966 ("1966 Act"), Pub.L. No. 89–508, 80 Stat. 308, which had been primarily designed to increase agencies' powers to compromise debts owed the United States. *E.g.,* S.Rep. No. 1331, 89th Cong., 2d Sess. 1–5, 8–9 (1966), *reprinted in* 1966 U.S.Code Cong. & Admin.News 2532, 2532–36, 2539; H.R. Rep. No. 1533, 89th Cong., 2d Sess. (1966). It was also structured to provide the agencies more teeth in their efforts to collect delinquent debts. *Id.* The 1966 Act provided in pertinent part that:

> "agency" means any department, office, commission, board, service, Government corporation, instrumentality or other establishment or body in either the executive or legislative branch of the federal government.

Pub.L. No. 89–508, § 2, 80 Stat. 308 (1966) (formerly codified at 31 U.S.C. § 951(a)). The 1982 Act provided additional enforcement tools to the agencies, including the interest and penalty provision that became section 3717. Debt Collection Act of 1982, Pub.L. No. 97–365, § 11, 96 Stat. 1749, 1755–56 (codified as amended in scattered sections of titles 5, 26, 31 & 42). The 1982 Act did not, however, alter the scope of the 1966 Act. Pub.L. No. 97–365, 96 Stat. 1749. It was at that time codified as 31 U.S.C. § 952(e).

In early 1983 the relevant portion of Title 31 was recodified in an effort to increase its clarity without affecting its substance. Revision of Title 31, U.S.C., Pub.L. No. 97–452, 96 Stat. 2467 (1983); *see also* Detailed Explanation Prepared by the Office of Law Revision Counsel, 1982 U.S.Code Cong. & Admin.News 4301. The statute codified the interest and penalty provision as section 3717 of the new title.

At no place in section 3717 is "executive or legislative agency" defined. The definitional section for Chapter 37 provides that " 'executive or legislative agency' means a department, agency, or instrumentality in the executive or legislative branch of government." 31 U.S.C. § 3701(a)(4).

Edison claims that application of the plain meaning rule of construction excludes the NRC from the authority provided by

section 3717 because it is an "independent" agency and therefore necessarily not an executive or legislative agency.[5] We disagree. The plain meaning argument actually cuts against Edison. The scheme of the Constitution envisions only three branches of government. Because the NRC is not within the judicial branch, it must be a legislative or executive agency.

The NRC was explicitly established by Congress as an "independent" agency, 42 U.S.C. § 5841(a). Its structural independence is due more specifically to the commissioners' insulation from dismissal by the President except for "inefficiency, neglect of duty, or malfeasance in office." 42 U.S.C. 5841(e). These are the explicit statutory features of the NRC's "independence." Neither of them suggests that Congress intended the NRC to be exempt from later legislation like the Debt Collection Act of 1982, and the parties have suggested no provision that would do so.[6] If Congress wished to exempt "independent" agencies in general or the NRC in particular from the reach of that act it could have said so explicitly. As it reads it exempts the judicial branch from its reach, but covers the entire gamut of legislative and executive agencies. The NRC must be an executive or legislative agency and nothing in the statute or its legislative history suggests that Congress intended to carve out a

5. Edison also relies on the definition at the head of Title 31: "In this title, 'agency' means a department, agency, or instrumentality of the United States Government." 31 U.S.C. § 101. Edison reads section 101 to signify an allegedly broader group of agencies: the executive, legislative, and "independent" agencies, and argues that this definition necessarily contrasts with that of section 3701(a)(4) to the effect that independent agencies are excluded from Chapter 37. We disagree.

The act recodifying Title 31 specifically provided that it worked no substantive change on the preexisting law, and section 101 was added by this recodifying act. Revision of Title 31, U.S.C., Pub.L. No. 97–258, 96 Stat. 877 (1982); *see also* Detailed Explanation Prepared by the Office of Law Revision Counsel, 1982 U.S.Code Cong. & Admin.News 4301. Thus it can neither add nor detract from the meaning of agency at any point in Title 31. It can only restate the preexisting law.

The definition section of Chapter 37 is of no more help for it merely makes clear that section

3717's language applies equally to departments, agencies, and instrumentalities of the federal government, thus preventing technical arguments that, for example, a cabinet department is not an agency within the meaning of the section.

6. Edison relies heavily on *Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), for the proposition that any agency with "quasijudicial" and "quasilegislative" duties is not a part of the executive branch. Edison's reliance upon *Humphrey's Executor* and its progeny, *see, e.g., Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Wiener v. United States,* 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958), is unsound. Those cases address the power of the President to dismiss the commissioners of certain agencies without cause, but instead for political or other purposes unrelated to the adequate perfomance of the official while in office.

special exception for the NRC in particular or the "independent" agencies in general.

Moreover, the purpose of Congress in passing the 1982 Act and the predecessor 1966 Act firmly supports our conclusion that the NRC is an executive or legislative agency for the purpose of section 3717. The intent of Congress was quite clearly to do all it could to provide the agencies and the Justice Department effective but fair tools for collecting the massive debts owed the United States. *E.g.,* S.Rep. 97–378, 97th Cong., 2d Sess. 1, *reprinted in* 1982 U.S.Code Cong. & Admin.News 3377; S.Rep. No. 1331, 89th Cong., 2d Sess. 1–5, 8–9 (1966), *reprinted in* 1966 U.S.Code Cong. & Admin.News 2532, 2532–36, 2539; H.R.Rep. No. 1533, 89th Cong., 2d Sess. (1966). Congress wished to address the problems of debts owed the United States in as broad and effective a manner as possible. Obviously, Congress's purpose would be better served by providing these tools to the independent agencies as well as to the rest of the agencies within the legislative or executive branches. Allowing and even requiring the NRC to take part in the recovery of debts owed to it is hardly inconsistent with the independence necessary for the NRC's commissioners and staff to regulate the nuclear power and research industries.

Finally, the act explicitly authorized the Attorney General to interpret its provisions, 31 U.S.C. § 3711(e)(2); *see also* 31 U.S.C. § 3717(h), and both parties to this litigation admit, as they must, that we owe significant deference to the Attorney General's interpretation. *See, e.g., Chevron, U.S.A., Inc., v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 546–66, 100 S.Ct. 790, 796–97, 63 L.Ed.2d 22 (1980). Both parties also agree that the Attorney General's interpretation of section 3717 is that it reaches independent agencies. *See* 4 C.F.R. §§ 101–105. Thus the Attorney General's interpretation matches our own reading of the section's language and purpose.

Therefore, we hold that under the circumstances of this case the NRC is an "executive or legislative agency" for the purposes of section 3717.

### B. *Penalty and Interest Provisions*

█ Edison argues that the NRC is precluded by its own regulations, *see* 10 C.F.R. § 15.37, from charging both interest and a late payment penalty fee on the overdue and unpaid portions of Edison's bill. This argument fails because the NRC also relied, as it was required to do, directly on its mandatory duty under section 3717.

Edison's only argument against the application of section 3717 is the one we have just rejected, namely, that the NRC is not an executive or legislative agency. Thus the NRC may properly apply the provisions of section 3717 to the overdue bills. Those provisions are mandatory and require that "[t]he head of an executive or legislative agency shall charge a minimum annual rate of interest on an outstanding debt on a United States Government claim," 31 U.S.C. 3717(a)(1), and that "the head of an executive or legislative agency shall assess on a claim owed by a person," 31 U.S.C. § 3717(e), "a penalty charge of not more than 6 percent a year for failure to pay a part of a debt more than 90 days past due," 31 U.S.C. § 3717(e)(2). Thus the plain language of the statute given its ordinary meaning requires the NRC to assess both interest and a late payment penalty. Section 3717(f) further confirms this reading by noting that "[i]nterest under subsection (a) of this section does not accrue on a charge assessed under subsection (e) of this section." Section (f) would be mere surplusage without meaning if interest and the late payment penalty could not be applied to the same debt; it would be unnecessary to prohibit interest from accruing on penalty charges if interest could never accrue on the same debt to which a penalty charge applied.

An agency, of course, cannot by regulation free itself from a duty imposed by statute, *see National Muffler Dealers Association, Inc. v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d

519 (1979); *Water Quality Association v. United States,* 795 F.2d 1303, 1306 (7th Cir.1986), and section 3717 is directly enforceable by agencies in the provisions pertinent here. Thus the NRC must enforce it.[7] The application of both interest and a late payment penalty was appropriate under the circumstances of this case.[8]

## VI

In accordance with the foregoing opinion, Edison's petition for review is DENIED.

---

**7.** While some of the provisions of the NRC's own debt-collection regulations appear potentially to conflict with the statute or the Federal Claims Collection Standards, we do not address any such issue because Edison did not raise it, and therefore waived it. *American Can v. Mansukhani,* 814 F.2d 421, 425 (7th Cir.1987); *Sanchez v. Miller,* 792 F.2d 694, 703 (7th Cir.1986); *Hunter v. Allis-Chalmers Corp.,* 797 F.2d 1417, 1430 (7th Cir.1986).

Edison has also waived its argument that the NRC may not allow interest or penalties to accrue during the period from the filing of its petition for judicial review until the issuance of a final decree granting or denying review. Edison waited until its reply brief to raise this argument. That is too late. Such belated attempts to introduce new issues violate the need of the judicial system for order and efficiency, and they make very difficult, if not impossible, any effective plenary consideration by the court. Such attempts also seek to expand the issues on appeal without effective notice to the opposing party and come at a time when the opposing party has no opportunity to make a written response. We have regularly refused to consider arguments raised for the first time in a reply brief. This case is no exception. *See, e.g., Rudell v. Comprehensive Accounting Corp.,* 802 F.2d 926 (7th Cir.1986); *In re: Matter of Peter Bear,* 789 F.2d 577, 579 (7th Cir.1986); *Beerly v. Department of Treasury,* 768 F.2d 942, 949 (7th Cir.1985). Edison's attempt in its petition for rehearing to conflate the issue of interest accrual during judicial review with the issue of the imposition of interest through section 3717 is frivolous. Its suggestion that refusing to reach the issue will work a manifest injustice fares no better. In the first place, the interest portion of the fees quite possibly merely represents a rough attempt to preserve the real value of the fees assessed over a period of nonpayment. There is certainly no manifest injustice in requiring Edison to pay the real value of the fees assessed if, as we have determined, those fees are lawful. Thus the only portion of the belated challenge that may have some possible merit is the challenge to the accrual of the penalty portion of the interest during the period of judicial review. *See United States v. Pacific Coast European Conference,* 451 F.2d 712 (9th Cir.1971); *Aminoil v. United States Environmental Protection Agency,* 599 F.Supp. 69 (C.D.Cal.1984). We are, however, reluctant to reach such an issue where Edison has not afforded the opposing party a chance to respond, and where Edison also apparently made no such argument to the NRC (despite the agency's indication that interest and penalty would continue to accrue), which failure would itself constitute an independently effective procedural waiver. *See, e.g., United States v. L.A. Tucker Lines,* 344 U.S. 33, 36–37, 73 S.Ct. 67, 68–69, 97 L.Ed. 54 (195?); *Illinois Commerce Commission v. ICC,* 776 F.2d 355, 362–63 (D.C.Cir.1985); *see also Seaboard System Railroad, Inc. v. ICC,* 799 F.2d 317, 334 (7th Cir.1986) (dicta). In addition, Edison has not suggested to us that it was prohibited from paying the fees under protest, thus preserving its right to judicial review and avoiding the imposition of *any* penalty or interest fees.

**8.** Edison has suggested in its brief that the NRC may have improperly calculated the starting date for the assessment of the late payment penalty. Edison argues that this reveals that the NRC was itself unsure whether to apply section 3717 or its own debt-collection provisions. The record suggests that the NRC itself either was unsure of which provisions to apply or thought them consistent. Nevertheless, the fact remains that in its final order the NRC relied on section 3717, and that statutory section controls over any inconsistent regulations.

While Edison has noted that the time for instituting the late payment penalty may have been calculated incorrectly, it has done so exclusively in its attempt to show that the application of section 3717 is inappropriate. Accordingly, that issue is not before us.